Christopher A. Seeger
David R. Buchanan
**SEEGER WEISS LLP**
550 Broad Street, Suite 920
Newark, New Jersey  07102
Tel:  (973) 639-9100
Fax:  (973) 639-9393

[additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL M. JOHNSON, Derivatively on Behalf of Nominal Defendant Conexant Systems, Inc. | Civil Action No. |
| Plaintiff, | |
| v. | |
| DWIGHT W. DECKER, ARMANDO GEDAY, DONALD R. BEALL, STEVEN J. BILODEAU, DIPANJAN DEB, F. CRAIG FARRILL, BALAKRISHNAN S. IYER, JOHN W. MARREN D. SCOTT MERCER, MATTHEW F. RHODES, JERRE L. STEAD, and GUISEPPE ZOCCO | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| Defendants, | |
| and | |
| CONEXANT SYSTEMS, INC., | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, Daniel M. Johnson derivatively and on behalf of Nominal Defendant Conexant Systems, Inc., by his undersigned attorneys, alleges upon the investigation made by and through plaintiffs counsel, which included, *inter alia*, a review of relevant public filings made by Nominal Defendant Conexant Systems, Inc. ("Conexant" or the "Company") with the Securities and Exchange Commission, ("SEC") as well as, teleconferences, press releases, news articles, analyst reports, and media reports concerning the Company. Furthermore, this Complaint is based upon plaintiff's personal knowledge as to plaintiff and plaintiff's own acts, and, upon information and belief, as to all other matters, based upon the aforementioned investigation.

### SUMMARY OF ACTION

1.      This is a shareholders' derivative action brought for the benefit of Nominal Defendant Conexant against certain officers and directors for their breaches of fiduciary duty and gross mismanagement during the period from March 1, 2004 through November 4, 2004, inclusive (the "Relevant Period").

### PARTIES

2.      Plaintiff Daniel M. Johnson ("Johnson" or "Plaintiff"), a citizen of Texas. Johnson is, and was at all relevant times, a shareholder of Nominal Defendant Conexant.

3.      Nominal Defendant Conexant is incorporated under the laws of the State of Delaware.  During the Relevant Period, the Company was headquartered at 100 Schultz Drive, Borough of Red Bank, Monmouth County, New Jersey 07701. On or about November 11, 2004, Conexant moved to 4000 MacArthur Boulevard, Newport

1

Beach, California 92660. Conexant designs, develops and sells semiconductor system solutions, comprised of semiconductor devices, software and reference designs, for use in broadband communications applications that enable high-speed transmission, processing and distribution of audio, video, voice and data to and throughout homes and business enterprises worldwide. The Company's access solutions connect people through personal communications access products, such as personal computers (PCs), set-top boxes and game consoles to audio, video, voice and data services over wireless and wire line broadband connections, as well as over dial-up Internet connections. The Company's central office solutions are used by service providers to deliver high-speed audio, video, voice and data services over copper telephone lines to homes and businesses around the globe.

4.     Dwight W. Decker ("Decker") is believed to be a resident of the state of New Jersey. He served as Conexant's Chairman of the Board throughout the Relevant Period and was named COO on November 9, 2004, thereby replacing Armando Geday.

5.     Armando Geday ("Geday") is believed to be a resident of the State of California. He served as Conexant's Chief Executive Officer and a Director from the beginning of the Relevant Period until his resignation on or about November 9, 2004.

6.     Donald R. Beall ("Beall") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

7.     Steven J. Bilodeau ("Bilodeau") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

8.     Dipanjan Deb ("Deb") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

2

9.     F. Craig Farrill ("Farrill") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

10.    Balakrishnan S. Iyer ("Iyer") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

11.    John W. Marren ("Marren") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

12.    D. Scott Mercer ("Mercer") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

13.    Matthew F. Rhodes ("Rhodes"), now believed to be a resident of California, is and was President of the Company during the Relevant Period.

14.    Jerre L. Stead ("Stead") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

15.    Giuseppe Zocco ("Zocco") is believed to be a resident of the State of California. He served as a Director throughout the Relevant Period.

16.    Defendants Geday, Iyer and Rhodes are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Conexant's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the

3

public, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Defendants Decker, Beall, Bilodeau, Deb, Farrill, Geday, Iyer, Marren, Mercer, Stead and Zocco are referred to collectively as the "Director Defendants."  The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Conexant's Quarterly Reports, press releases and presentations to Securities analysts, money and portfolios managers and institutional investors, i.e. the market.  Each Director Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of the Director Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Director Defendants are liable for the false statements pleaded herein, as those statements where each "group published" information, the result of the collective action of the Director Defendants.

4

18.    Each of the above officers and directors of Conexant, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

19.    As officers and directors of a publicly-held company, the Individual and Director Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, as well as, present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual and Director Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

20.    The Individual and Director Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were

5

aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Conexant, each of the Individual and Director Defendants had access to the adverse, undisclosed information about Conexant's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Conexant and its business issued or adopted by the Company materially false and misleading.

21.    The Individual and Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. The Individual and Director Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual and Director Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

22.    Each of the Individual and Director Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Conexant securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Conexant's business, operations, management and the intrinsic value of Conexant securities.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331(a)(2) as a Federal question exists.

24.    Also, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

25.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

26.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual and Director Defendants' primary participation in the wrongful acts detailed herein, occurred in this district, and Conexant maintained its corporate headquarters in this District, in Red Bank, New Jersey during the Relevant Period.  Further, Defendant Decker either resides in or maintains executive offices in this district, and has received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## FACTUAL BACKGROUND

**The Company**

27.    Conexant designs, develops and sells semiconductor system solutions for use in products driving broadband digital home information and entertainment applications.

28.    According to the Company's website:

Conexant is a worldwide leader in semiconductor solutions for broadband communications, enterprise networks and the digital home. Conexant's

7

merger with GlobespanVirata in February 2004 created an industry powerhouse that enables the seamless delivery of broadband information between public access networks and. the homes and businesses they serve. Key semiconductor products include digital subscriber line (DSL) and cable modem solutions, home network processors, broadcast video encoders and decoders, digital set-top box components and systems solutions, and the company's foundation dial-up modem business. Conexant also provides a full range of standards-based integrated circuits, software wd reference designs for all symmetric and asymmetric DSL CO applications, which have been recognized as the industry's number one copper wire solutions for broadband communications.

29.     On November 3, 2003, Conexant announced that it had signed a definitive

agreement to purchase GlobespanVirata in a strategic merger.   The press release, in

pertinent part, stated:

> "Conexant has been focused exclusively on delivering the technology and products that are driving the digital home, one of the semiconductor industry's most exciting and highest-growth opportunities," said Dwight W. Decker, Conexant chairman and chief executive officer. "With the addition of GlobespanVirata's highly complementary product portfolio, we gain key end-to-end digital subscriber line connectivity with a leading position in central office applications worldwide. We also benefit by adding GlobespanVirata's leadership position in wireless local area networking, a critical technology for the digital home."

> "From a financial perspective, we have the opportunity to capture significant operating efficiencies, and we anticipate that the merger will be accretive within six to nine months from the close of the transaction," Decker continued. "Together, we will have the scale and scope to make the necessary R&D investments for continued innovation leadership in wired and wireless communications and multimedia applications for the digital home."

> "Combining GlobespanVirata with Conexant allows us to complement our leadership in broadband communications capabilities with leadership in broadband media processing capabilities, including broadcast video encoders and decoders as well as digital set-top box system solutions for cable, satellite, terrestrial data and digital video networks," said Armando Geday, president and chief executive officer of GlobespanVirata. "I am confident that the new merged company will deliver stronger financial performance and create more value for our shareholders, customers and employees than either company could operating independently."

8

"This merger will result in the creation of a new company with the management expertise, talent resources, technology, market positions, and critical mass to succeed in an increasingly competitive industry," said Matt Rhodes, Conexant's president.

*      *      *

About the Transaction

Under the terms of the merger agreement, which has been unanimously approved by the boards of directors of both companies, GlobespanVirata shareholders will receive 1.198 shares of Conexant common stock for each share of GlobespanVirata stock. Based on the fully diluted share counts for the two companies as of market close on Friday, October 31, 2003, current Conexant shareholders will own 62.75 percent and current GlobespanVirata shareholders will own 37.25 percent of the combined company's shares. The transaction is subject to customary closing conditions, including shareholder and regulatory approvals, and is expected to be completed in the first quarter of calendar 2004.

30.     On January 15, 2004, Conexant filed with the SEC its Amendment No. 1 to its Registration Statement on Form S-4, which was declared effective by the SEC on January 16, 2004.    The Registration Statement contained a Joint Proxy Statement/Prospectus with respect to the meetings of shareholders of Conexant and Globespan to approve the merger and the securities of Conexant to be issued to Globespan shareholders in exchange for their Globespan securities.

31.     On January 28, 2004, Conexant released its financial and operational results for the first quarter ended January 2, 2004.  The press release, in pertinent part, stated:

Conexant Systems, Inc. (Nasdaq: CNXT), a worldwide leader in semiconductor system solutions for digital home information and entertainment networks, today announced revenues of $177.3 million for the first quarter of fiscal 2004, which ended January 2, 2004. First fiscal quarter 2004 revenues increased 23 percent over first fiscal quarter 2003 revenues of $144.2 million, and 8 percent over fourth fiscal quarter 2003 revenues of $164.7 million. First fiscal quarter pro forma operating profit was $17.2 million, or 9.7 percent of revenues, compared to $0.5 million in the year-ago quarter. First fiscal quarter 2004 pro forma operating profit increased by 158 percent from $6.7 million in the fourth fiscal quarter of

9

2003. On a pro forma basis, net profit for the first fiscal quarter of 2004 was $0.04 per diluted share, compared to $0.01 per diluted share in the fourth fiscal quarter of 2003.

"Conexant first fiscal quarter revenues of $177.3 million grew 23 percent on a year-over-year basis and above expectations at 8 percent sequentially," said Dwight W. Decker, Conexant chairman and chief executive officer. "This growth was driven by milestone performances in three of our key growth initiatives, with record unit shipments in each of our client-side ADSL, satellite set-top box and PC video businesses."

"We also delivered another quarter of accelerated earnings growth, posting first fiscal quarter pro forma operating profit of $17.2 million, which is approximately 10 percent of sales and a sequential improvement of 158 percent. This marks the third consecutive quarter in which we have more than doubled our pro forma operating profit, and is a dramatic improvement from our essentially breakeven performance a year ago."

Conexant's pro forma results are a supplement to financial statements based on generally accepted accounting principles (GAAP). Conexant uses pro forma information to evaluate its operating performance and believes this presentation provides investors with additional insight into its underlying operating results. A full reconciliation between the pro forma and GAAP results from continuing operations is included in the accompanying financial data. Presented on a GAAP basis, the net income for the first quarter of fiscal 2004 was $40.6 million, or $0.13 per diluted share, compared to a net loss of $4.8 million, or $0.02 per diluted share, in the first quarter of fiscal 2003, and a net income of $37.2 million, or $0.12 per diluted share, in the fourth fiscal quarter of 2003.

Gross margin for the first fiscal quarter was 44.6 percent, up approximately one percent from the previous quarter. Pro forma operating expenses of $61.9 million were in line with the company's expectations. Conexant's cash, cash equivalents and short-term investments totaled $188.3 million at the end of the quarter, reflecting a sequential increase of $12.8 million.

**Second Quarter Fiscal 2004 Outlook**

"Our second fiscal quarter is a seasonally weak period for most of the markets Conexant addresses, with typical revenue declines of approximately 5 to 10 percent," Decker said. "However, even from our higher-than-expected prior-quarter revenue base, continued strength in our growth initiatives is expected to drive a less-than-seasonal revenue decline of 3 to 5 percent. We anticipate that gross margin will remain between 44 and 45 percent, and we expect to hold pro forma operating expenses flat at approximately $62 million."

10

## FALSE AND MISLEADING STATEMENTS

32.     Throughout the Relevant Period, the Individual and Director Defendants issued statements, press releases and filed quarterly and annual reports with the SEC describing the Company's business operations and financial condition. These representations were materially false and misleading because they failed to disclose the following adverse facts: (a) that the Company was stuffing the channel with products, such that its revenues did not reflect the true, end-user demand for its products; (b) that the Company's inventory glut would lead to lowered revenues as distributors and retailers would need to exhaust existing inventory before purchasing new products from Conexant; (c) that the combined company was suffering from serious operating deficiencies, particularly in the wireless local area network ("WLAN") division of Globespan that was not effectively integrated into the combined company's operations, causing the Company to lose its leadership position in the WLAN market; (d) that, contrary to Defendants express representations that the Globespan integration was "on schedule" and that "outstanding progress" was being made in that regard, integration of the Globespan acquisition was mishandled, causing such a massive drain on the Company that, by the end of the Relevant Period, the outlook for the much larger combined company was worse than Conexant's standalone prospects.

33.     The Relevant Period begins on March 1, 2004. On that day, Conexant issued a press release announcing the closing of the Globespan merger. In the release, titled "Conexant and GlobespanVirata Merger Creates a Worldwide Leader in Communications Semiconductors," Defendant Geday touted the strong leadership

11

position of the new company, noting its "unique combination of products and technology":

> "We successfully combined the highly complementary product and technology portfolios of Conexant and GlobespanVirata to create a. worldwide leader in semiconductor solutions for broadband communications, enterprise networks and the digital home, three of the industry's most exciting and fastest growing segments," said Armando Geday, Conexant's chief executive officer. "The new Conexant has leading positions in digital subscriber line connectivity, wireless local area networking, dial-up modems, home networking, broadcast video products and digital set-top box system solutions. Our unique combination of products and technologies will drive broader, deeper engagements with worldwide customers that are recognized leaders in broadband communications and consumer electronics."

Geday further represented that "outstanding progress" had been made towards integrating Conexant's and Globespan's "organizations, systems, technologies and processes," stating:

> "We have made outstanding progress toward integrating the organizations, systems, technologies and processes of Conexant and GlobespanVirata over the past two months and are in a strong position as we begin combined operations today," said Geday. "The new Conexant has the scale and scope to make the necessary R&D investments for continued innovation leadership. We remain completely confident that the merged company will deliver stronger financial performance and will create more value for our shareholders, customers and employees than either Conexant or GlobespanVirata could have operating independently."

34.    On April 26, 2004, Conexant announced results for its second 2004 fiscal quarter, ended April 2, 2004. In a press release, Individual and Director Defendants represented that the integration effort was proceeding on schedule and highlighted several product lines that supposedly continued to expand the Company's industry-leading position:

> RED BAND, N.J., April 26,2004-Conexant Systems, Inc. (NADAQ:CNXT), the worldwide leader in semiconductor solutions for broadband communications, enterprise networks and the digital home, today announced revenues of $243 million for the second quarter of fiscal 2004,

12

which ended April 2, 2004. This is the company's first earnings report following the completion of the merger with GlobespanVirata, Inc, on February 27, 2004. Conexant's second fiscal quarter report incorporates the results of GlobespanVirata from February 29, 2004 through April 2, 2004. The company also announced that approximately 200 positions would be eliminated by the end of the calendar year, primarily as a result of overlapping personnel and functions due to the merger.

"Since the close of the Conexant-GlobespanVirata merger transaction, our team has done an outstanding job of integrating processes, systems, technologies and organizations, and we have a clear path to the successful completion of our integration work," said Armando Geday, Conexant's chief executive officer. "Combined company revenues of $293.3 million in out second fiscal quarter reflected strength in our growth platforms, which include products for digital subscriber line connectivity and wireless local area networking as well as digital set-top box and P video solutions. This strength was partially offset by normal seasonal weakness in our universal access business."

In the second fiscal quarter, Conexant continued to expand its industry-leading positions in providing solutions for digital subscriber line (DSL), wireless local area networking (WLA), PC video, digital set-top box and dial-up modem applications.

The company's DSL business confirmed its leadership position, achieving cumulative shipments of more than 82 million ports to its global customer base. Conexant's DSL product portfolio includes both customer premise and central office solutions, with support for all -major industry standards including SHDSL, ADSL2, ADSL2plus, and Annex A, B and C.

Wireless LAN products containing the company's new, innovative PRISM Nitro XM™ Xtreme Multimedia software solution are now available from Major retailers. Products incorporating this software are capable of delivering throughput rates up to 140 Mbps, enabling users to stream multiple channels of high quality video, music and information throughout the home. It is the first standards-compliant, non-proprietary technology to support the highest useable data rate at both the access point/router and the client while maintaining complete compliance to the IEEE 802.11 standards.

The pioneer and world leader in PC video chipset solutions, Conexant announced that it will incorporate support for PCIExpreos™ technology in its video decoder product portfolio.

Decoders with this robust new protocol support high resolution, computationally intensive video processing applications in personal computers, set-top boxes and other consumer devices. PCT Express

13

technology also facilitates the simultaneous receipt and display of high-quality visual images from multiple digital and analog broadcast sources.

Set-top box highlights included the introduction of a next-generation advanced modulation satellite demodulator. The CX24114 increases satellite throughput by up to 35 percent enabling satellite service providers to transmit additional channels and services using existing bandwidth. The C24114 can also be used in conjunction with Conexant's CX24118 tuner to create a complete satellite front-end system solution.

With eight consecutive generations of market-share leadership, Conexant delivered yet another first in dial-up modern semiconductor technology with the introduction of a new modem chip that supports Intel's High Definition Audio (IUD Audio) bus architecture audio standard. The CX11.254 is the first in a family of planned products. it uses the 11D Audio bus to transmit data between an internal narrowband modem and notebook and desktop computers, and supports the high-quality audio required for advanced applications such as streaming video and voice over 1P.

Speaking about the Company's expected growth, Defendant Geday stated that revenues in the third quarter would grow 5 to 10 percent sequentially with pro-forma net earnings per share of $0.03 to $0.05:

"The June quarter will be our first complete quarter as a combined company, and we are enthusiastic about the prospects for the new Conexant," Geday said. "The combined company is addressing high-growth opportunities in broadband communications, enterprise, networks and the digital home with a world-leading portfolio of products and technologies differentiated. by its depth and breadth."

"In the third fiscal quarter, we expect revenues to grow in a range of 5 percent to 10 percent sequentially to between $308 million and $323 million," Geday continued… "We anticipate that gross margin will be between 42 percent and 44 percent of sales, and we expect to deliver pro forma non-GAAP net earnings per share of $0.03 to $0.05, based on approximately 525 million fully diluted shares."

35.    The statements referenced above were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others: (a) that the Company was stuffing the channel with products, such that its revenues did not reflect the true, end-user demand

14

for its products; (b) that the Company's inventory glut would lead to lowered revenues as distributors and retailers would need to exhaust existing inventory before purchasing new products from Conexant; (c) that the combined company was suffering from serious operating deficiencies, particularly in the wireless local area network ("WLAN") division of Globespan that was not effectively integrated into the combined company's operations, causing the Company to lose its leadership position in the WLAN market; (d) that, contrary to Individual and Director Defendants' express representations that the Globespan integration was "on schedule" and that "outstanding progress" was being made in that regard, integration of the Globespan acquisition was mishandled, causing such a massive drain on the Company that, by the end of the Relevant Period, the outlook for the much larger combined company was worse than Conexant's stand-alone prospects.

36.    On July 6, 2004, Conexant lowered its third fiscal quarter outlook, supposedly due to a shortfall in its wireless local area network ("LAN") business, stating as follows in relevant part:

RED BANK, N.J., July 6, 2004 -- Conexant Systems, Inc. (NASDAQ:CNXT), the worldwide leader in semiconductor solutions for broadband communications, enterprise networks and the digital home, today announced that it expects revenues for its third fiscal quarter, which ended July 2, 2004, to be lower than anticipated due primarily to weakness in its wireless local area network (WLAN) business.

Conexant now expects total third fiscal quarter revenues to be between 5265 million and $270 million and pro forma non-GAAP net earnings per share (EPS) of $0.02, compared to expectations in April of revenues between $308] million and $323 million and pro forma non-CAAP EPS of $0.03 to $0.05.

"In the third fiscal quarter, a shortfall in demand in our wireless LAN business led to overall company performance that was less than we expected at the beginning of the quarter," said Armando Geday, Conexant's chief executive officer. "Our other businesses, which include

15

solutions for dial-up and digital subscriber line connectivity as well as digital set-top lox and PC video applications, were essentially flat, and we are absolutely confident in the long-term prospects for the combined company."

37.    The price of Conexant common stock dropped from $4.08 per share on July 2, 2004, to $2.31 per share the next trading day in reaction to this announcement. The price of the Company's stock, however, continued to be artificially inflated because Defendants concealed the true reasons for the shortfall which included serious, structural problems such as the failure to integrate the Globespan operations and an inventory glut at distributors and retailers that had accumulated for five quarters and would take several quarters to pare down.    Individual and Director Defendants' statements were materially false and misleading for the reasons particularized above.

38.    On July 29, 2004, Conexant announced in a press release the following results for its fiscal 2004 third quarter:

Conexant Systems, Inc. (NASDAQ:CNXT), today announced revenues of $267.6 million for the third quarter of fiscal 2004, which ended July 2, 2004. The company's third fiscal quarter performance was in line with its revised outlook provided on July 6, 2004.

Third fiscal quarter 2004 revenues of $267.6 million decreased 9 percent from the second fiscal quarter revenues of $293.3 million the company would have reported if its merger with GlobespanVirata, which closed can February 27, 2004, had closed on January 1, 2004. Third fiscal quarter 2004 revenues increased 77 percent over third fiscal quarter 2003 revenues of $151.0 million. The net loss for the third quarter of fiscal 20014 was $71.4 million, or $0.15 per diluted share, compared to a. net loss of $49.1 million, or $0.18 per diluted share, in the third quarter of fiscal 2003, and a net loss of $143.4 million, or $0.41 per diluted share, in the second quarter of fiscal 2004.

Third fiscal quarter 2004 pro forma operating profit was $8.1 million, or 3.0 percent of revenues, compared to $3.3 million in the year-ago quarter. Third fiscal quarter 2004 pro forma operating profit decreased by 40 percent from the $13.5 million the combined company would have reported in the second fiscal quarter of 2004 if the merger had closed can January 1, 2004. On a pro forma basis, net profit for the third fiscal quarter

16

of 2004 was $0.02 per diluted share, compared to $0.02 per diluted share in the third fiscal quarter of 2003.

39.    Defendant Geday commented as follows regarding the results and discussed expectations for the fourth quarter.

> As we stated previously, Conexant's overall third fiscal quarter performance was adversely impacted by a shortfall in demand in our wireless LAN business," said Armando Geday, Conexant's chief executive officer. "We are intensifying our effort to regain and expand our market position.
>
> "While our other businesses came in essentially flat for the third fiscal quarter, we remain optimistic about the growth prospects for our company," Geday added.
>
> We expect revenues for Conexant's fourth fiscal quarter to be between $250 million and $255 million", Geday said. "We anticipate that gross margin will be in a range between 40 and 42 percent, and we expect to further reduce our pro forma operating expenses by $3 million to $4 million, Finally, we anticipate that our pro forma non-GAAP net earnings per share will be in a range from $0.00 to $0.02 per share based on approximately 500 million fully diluted shares."

40.    Individual and Director Defendants' statements were materially false and misleading for the reasons particularized above.

41.    On August 13, 2004, Conexant announced that it would reduce "its worldwide workforce by approximately 300 employees by the end of the calendar year. The headcount reduction is a result of further merger-related synergies and the company's revenue outlook for the September quarter, which was communicated in the company's quarterly earning call on July 29, 2004, and is lower than the company expected one quarter ago."

42.    On September 30, 2004, Conexant lowered its financial outlook for the fourth quarter of 2004, citing weakness in demand for its products:

> RED BANK, N.J., Sept. 30, 2804 - Conexant Systems, Inc. (NASDAQ: CNXT), a worldwide leader in semiconductor solutions for broadband

17

communications, enterprise networks and the digital home, today announced that it expects revenues for its fourth fiscal quarter, which ends Friday, October 1, 2004, to be in a range of $210 million to $215 million due primarily to excess channel inventory in Asia that is a result of lower-than-expected demand. The company anticipates that pro forma non-GAAP earnings per share (FPS) will range from a loss of $0.02 to a. loss of $0.01, compared to the guidance range of pro forma non-GAAP income of $0.00 to $0.02 per share established in July. "Conexant's lowered fourth fiscal quarter expectations are a direct result of excess channel inventory in our service-provider and PC-related businesses," said Armando Geday, Conexant's chief executive officer. "Ongoing softness in customer demand, reduced product lead times and price erosion also resulted in weakness in our turns business. "For our fourth fiscal quarter, we expect gross margin to be at the low end of the range of 40 to 42 percent that we anticipated in July, and we expect to reduce pro forma operating expenses by considerably more than the $3 million to $4 million we anticipated in July, to a level approaching $95 million from $104.4 million last quarter,"

43.     Conexant's stock price did not react adversely to this announcement. The artificial inflation in Conexant's securities continued, as the full truth concerning its business, and the real reasons behind its disappointing performance remained undisclosed. The Individual and Director Defendants' statements were materially false and misleading for the reasons particularized above. The Individual and Director Defendants, as they had done in the July 6, 2004 release, attributed the negative results and outlook to general market forces rather than the serious, company-specific problems that were responsible for the weakening results.

## THE TRUTH IS REVEALED

44.     On November 4, 2004, Conexant issued a press release announcing disappointing results for the fourth quarter of 2004, including a loss of $367.5 million ($0.79 per share) which they blamed on poor demand, an inventory glut, and the failure to introduce new products:

Conexant Systems, Inc. (NASDAQ:CNT), today announced revenues of $213.1 million for the fourth quarter of fiscal 2004, which ended Oct. 1,

18

I:\Conexant\Complaint.doc

2004. The company's fourth fiscal quarter performance was consistent with its revised outlook provided on Sept. 30, 2004.

The merger of Conexant and GlobespanVirata was completed on Feb. 27, 2004. Since then, results have been reported on a combined-company basis. Certain financial comparisons in this press release present combined-company results with pre-merger Conexant-only results.

Fourth fiscal quarter 2004 revenues of $213.1 million decreased 20 percent from the third fiscal quarter revenues of $267.6 million. Fourth fiscal quarter 2004 revenues increased 24 percent over fourth fiscal quarter 2003 revenues of $164.7 million as a result of the merger. The net loss for the fourth quarter of fiscal 2004 was $367.5 million, or $0.79 per diluted share, compared to net income of $37.2 million, or 50.12 per diluted share, in the fourth quarter of fiscal 2003, and a net loss of $71.4 million, or $0.15 per diluted share, in the third quarter of fiscal 2004. Included in the fourth quarter of fiscal 2004 net loss is a $256.0 million non-cash charge for the impairment of deferred tax assets.

Fiscal year 2004 revenues of $901.9 million increased 50 percent over fiscal 2003 revenues of $600.0 million as a result of the merger. The net loss for fiscal 2004 was $541.6 million, or $1.34 per diluted share, compared to a net loss in fiscal 2003 of $705.3 million, or $2.56 per diluted share. The net loss in fiscal 2003 includes a $725.9 million loss from discontinued operations.

"Conexant's sequential decline in revenues to $213.1 million in the fourth fiscal quarter was largely due to excess channel inventory that resulted from lower-than-expected customer demand," said Armando Geday, Conexant's chief executive officer. "As is often the case during an inventory correction, our revenue decline was exacerbated by average selling price erosion caused by an unfavorable product mix as newer, more valuable products were slower to ramp. While our visibility continues to be limited, we remain confident in Conexant's long-tear prospects."

45.    Later that day, Conexant held a conference call to discuss the Company's fourth quarter results. 'The call was available publicly on the Company's website and a transcript of the call was available from various publications, such as *Fair Disclosure Wire.* Defendant Geday's response to an analyst's question revealed that the Company's inventory glut was not a recent phenomenon, but had been building for as many as five quarters:

19

I:\Conexant\Complaint.doc

JEFF LAW (ph), ANALYST, CREDIT SUISSE FIRST BOSTON: It's Jeff Law for Michael. You guys got it down to another pretty big revenue decline. I'm curious, you said most of that was inventory. But could you parse out how much of that was inventory versus demand? And then secondly, how long is it going to take to burn off inventory?

ARMANDO GEDAY: Looking back at the inventory correction, it looks like the inventory has been building for multiple quarters, maybe 4 or 5 quarters. And the reason it built is because there was anticipated higher end demand than what actually happened. As a result of that, the demand continues to grew at normal rates, and while we cannot predict how long it will take us to burn it off, given that our revenue decline was much faster than the revenue ramp in the number of quarters that it has taken us to build it, we believe it will take us fewer quarters to burn it than it has to build it. But we are not guiding beyond one quarter at this point.

46.    The price of Conexant securities dropped to $1.60 per share on November 5, 2004 in reaction to the Company's press release and conference call.

47.    On November 9, 2004, the Company announced that Defendant Decker, who had served as the Company's Chairman, would replace Defendant Geday as Chief Executive Officer.   Although the Company's press release stated that Geday left the Company for "personal reasons," industry commentators reported that Geday had been forced out for mishandling the Globespan acquisition.

48.    A *Los Angeles Times* article dated November 10, 2004 and entitled "Conexant Founder Returns as CEO" stated, in part, as follows:

Communications chip maker Conexant Systems, Inc. moved Tuesday to undo some of the damage from its roughly $1.2-billion acquisition of GlobespanVirata Inc., reappointing founder Dwight Decker as chief executive and moving the firm's headquarters back to Newport Beach from Red Bank, N.J.

Conexant has racked up more than $439 million in losses since the deal closed in late February.   Those losses have been "unexpected and unacceptable," said Decker, who had been serving as chairman of the combined company.

Decker blamed the losses on a decline in the market for DSL equipment for high-speed Internet access--especially in Japan and China--and on

20

I:\Conexant\Complaint.doc

internal mismanagement that led to delays in new products that cost market share.

He did not specifically criticize outgoing CEO Armando Geday, who had been CEO of GlobespanVirata.  Geday resigned Tuesday for personal reasons, the company said.

"Conexant has underperformed this whole year compared to what we expected, and we all agreed that this was the best thing to do, " Decker said in an interview.

Slumping demand and product delays will slash Conexant's revenue in the quarter that ends in December to about $180 million, down from $297 million a year earlier, Decker said.

Conexant's shares have lost 78% of their value since the company completed its purchase of GlobespanVirata.  They rose 1 cent to $1.62 in regular Nasdaq trading Tuesday and moved only slightly in extended trading after the executive charges were announced.

49.    The next day, the following article appeared in the industry publication

*Electronics Supply* & *Manufacturing*:

Geday out, Decker back in as Conexant CEO

WAYNE, N.J. - After a series of financial setbacks, Conexant Systems has forced Armando Geday to step down as CEO and replaced him with former Conexant CEO and current chair Dwight Decker.

Geday took the helm at Conexant after steering GlobespanVirata from a startup to one of the largest chip players in the DSL sector. He also helped orchestrate the deals that allowed GlobespanVirata to acquire Intersil's wireless LAN (WLAN) chip group and that allowed GlobespanVirata to merge its operations with Conexant.

But, the Intersil deal and tough competition in the Asia markets, turned out to hurt Geday in his role as Conexant CEO. In July, Conexant cut its third quarter outlook from between $308 million and $323 million to between $265 million and $270 million. At the time, Geday blamed price erosion of 802.11g products and increased Taiwanese competition in the WLAN sector as a main driver for the reduced outlook.

The reduced financial outlook led Conexant to make cuts in its employee base. The company said it would cut 200 employees in April and then announced in July that an additional 300 employees would lose their jobs.

Picking Up the Pieces

21

For Decker, heading up Conexant is nothing new after serving as the company's CEO from January 1999 until February 2004. But this time around, Decker will have his hands full as he takes over Conexant.

Decker faces a WLAN business that once dominated the sector but has now lost significant market share. He will also find a DSL and media processing business that failed to meet expectations.

Clearly, Conexant plans to make big changes on the WLAN front. "We made bets that were significant," Decker said. "Those bets weren't right."

50.     Information provided by analysts and media reports painted a stark picture of the Company's business, exposing the seriousness of what had been withheld from investors by Defendants. For example, a November 11, 2004 article in the *TheDeal.com,* titled, "Conexant Dumps CEO," reported that the Globespan acquisition "was essentially neglected -- nothing was done to snake sure it stayed competitive and kept building products," and highlighted a number of serious problems that had been undisclosed during the Relevant Period:

The chipmaker has struggled since its merger with GlobespanVirata last year.

The board of Conexant Systems inc. has dismissed CEO Armando Geday amid the chipmaker's fumbles in absorbing acquisitions and his poor relations with Wall Street.

Geday, who was CEO of digital subscriber line chip specialist GlobespanVirata Inc. until it merged in February with Conexant in an $853 million pact, resigned for "personal reasons," according to a Conexant statement issued Tuesday, Nov. 9. The struggling company named chairman and former chief executive Dwight Decker to replace him as CEO.

But observers said the enlarged company flagged under Geday's watch, with the steepest decline coming in one unit that produced chips for wireless local area networks. The business was the top producer of WTAN chips when GlobespanVirata bought it from Intersil Corp. in August 2003 for $368 million.

Less than three months later, when Conexant and GlobespanVirata announced their own tie-up, integrating the WLAN unit became much less

22

of a priority, said C.E. Unterberg, Towbin Inc. senior analyst Dushyant Desai.

"That acquisition was essentially neglected -- nothing was done to make sure it strayed competitive and kept building products", Desai said. "It is pretty amazing to see a group which is a leader in the industry move into the also-ran category in little over a year."

During a conference call, Decker said Conexant's share of the WLAN market has declined and that the company has been forced to slash its prices for these chips.

"There were significant bets, and they weren't right," he said of the way the WLAN chip unit was run under Geday.

Shares of Conexant Wednesday climbed nearly 7%, to $1.73, on a day when chip stocks broadly declined.

Integration problems from the Conexant-GlobespanVirata merger also appear to have played a role in Geday's departure. Decker, 54, suggested that the former management fell short in marrying the companies' parallel DSL and wireless technology offerings, as well as their sales and administration functions.

"It is a merger in process, and not everything is done as well as we'd like," admitted Decker, who had been CEO of Conexant since it spun off from Rockwell International Corp. in 1999.

Conexant also announced plans to cut operating expenses by 15% during the current fiscal year, which ends in September. Savings will come from continued merger-related consolidation and from focusing on less expensive product development, Decker said. The company is seeking to cut costs by 25%, he said.

Accomplishing this is critical to restoring Conexant's credibility with investors and to proving that it can wring some value out of its merger with GlobespanVirata, Desai said.

"Not only has the opportunity for post-merger synergies and operational efficiency all but disappeared, but the combined company revenue and outlook is also lower than standalone Conexant in the past," he said.

Last week, Conexant, which makes a range of chips for networking and communications products, reported a net quarterly loss of $367.5 million. In the year-earlier period, the company posted a $37.2 million profit.

23

"I take on this assignment with considerable concerns over our recent financial performance but with a very clear optimism about Conexant's fundamental business prospects," Decker said.

The executive said Conexant's headquarters, which had shifted to GlobespanVirata's home base in Red Bank, N.J., after the merger, would return to Newport Beach, Calif., where Conexant was originally located. Decker also said Conexant would undergo a "comprehensive reassessment of leadership and the general management team."

Analysts welcomed Decker's return in part because of his clear and frank communication style.

"Geday carne to Conexant with a poor track record at GlobespanVirata of setting expectations and communicating to investors," Desai said. "Once he was at Conexant, they had one quarter after another of forecast misses."

51.     As alleged herein, the Individual and Director Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Conexant, their control over, and/or receipt and/or modification of Conexant's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Conexant, participated in the fraudulent scheme alleged herein.

52.     The Individual and Director Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

the purchasers of the Company's securities in an effort to maintain artificially high market prices for Conexant securities.

53.    The Individual and Director Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Conexant as specified herein.

54.    The Individual and Director Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Conexant's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Conexant and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Conexant securities during the Relevant Period.

55.    The Individual and Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the

25

purpose and effect of concealing Conexant's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual and Director Defendants' misstatements of the Company's business, operations and earnings throughout the Relevant Period, the Individual and Director Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

     56.    Additionally, several Defendants, Geday, Iyer and Rhodes sold hundreds of thousands of shares of common stock at artificially high prices as listed in the chart below:

| Name | Date | Shares Sold | $ Gross Proceeds |
|------|------|-------------|------------------|
| Geday, Armando | 8/13/2004 | 452,826 | $679,239 |
| Rhodes, F. Matthew | 4/1/2004 | 15,000 | $93,000 |
| Rhodes, F. Matthew | 3/1/2004 | 25,000 | $186,000 |
| Iyer, Balakrishnan | 3/1/2004 | 50,000 | $370,000 |
| | Total | 542,826 | $1,328,239 |

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

     57.    Plaintiff brings this action derivatively in the right and for the benefit of Conexant to redress injuries suffered and to be suffered by Conexant as a result of the breaches of fiduciary duty by the Individual and Director Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

     58.    Plaintiff will adequately and fairly represent the interests of Conexant and its shareholders in enforcing and prosecuting its rights.

I:\Conexant\Complaint.doc

59.    Plaintiff is an owner of Conexant common stock and was an owner of Conexant common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

60.    Conexant's Board of Directors is currently composed of ten (10) directors – Donald R. Beall, Steven J. Bilodeau, Dipanjan Deb, Dwight W. Decker, F. Craig Farrill, Balakrishnan S. Iyer, John W. Marren, D. Scott Mercer, Jerre L. Stead, and Giuseppe Zocco.  Each of these Directors has been named as a Defendant herein. Defendant Geday did serve on the Board during part of the Relevant Period, but resigned his seat when he left the Company in November, 2004.

61.    Defendant Decker has served as the Chairman of the Board of Directors since December, 1998, and as a non-executive chairman from February, 2004 to November, 2004.  He was the Company's Chief Executive Officer from January, 1999 to February, 2004 and again since November, 2004.  He is a member of the Investment Management Committee of the Board of Directors.  Decker is a non-executive chairman of the board of Mindspeed Technologies, Inc. and Skyworks Solutions, Inc., and is a member of the board of directors of Jazz Semiconductor, Inc.

62.    Defendant Beall has served on the Board of Directors since 1998.  He is currently a member of the Governance & Board Composition, the Compensation & Management Development, and the Investment Management Committees.  Beall is the retired chairman and CEO of Rockwell International Corporation.  In 1998, Rockwell International Corp. spun off its semiconductor business, Rockwell Semiconductor Systems, Inc., which became Conexant.   Beall is also a director of Mindspeed Technologies, Inc., Skyworks Solutions, Inc. and Jazz Semiconductor, Inc.

27

63.    Defendant Bilodeau has served on the Board of Directors since February 2004, and was a director of GlobespanVirata.  He is currently a member of the Audit and the Governance & Board Composition Committees.

64.    Defendant Deb has been a member of the Board of Directors since February 2004, and was a director of GlobespanVirata.  He is a member of the Governance & Board Composition, the Compensation & Management Development, and the Investment Management Committees.

65.    Defendant Farrill has been a member of the Board of Directors since 1998, and is a member of the Governance & Board Composition Committee.

66.    Defendant Iyer has been a member of the Board of Directors since 2002 and is a member of the Investment Management Committee.  He served as senior vice president and CFO from January 1999 to June 2003.  Iyer is the former senior vice president and CFO of Rockwell Semiconductor Systems, Inc., which later became Conexant.  He has served as a consultant to Mindspeed Technologies, Inc., and is a director of Skyworks Solutions, Inc.

67.    Defendant Marren has been a member of the Board of Directors since February 2004.  Prior to that, he was a director of GlobespanVirata.

68.    Defendant Mercer has been a member of the Board of Directors since 2003.

69.    Defendant Stead has been a member of the Board of Directors since 1998.  He is also a director of Mindspeed Technologies, Inc.

70.    Defendant Zocco has been a member of the Board of Directors since February 2004.  Prior to that, he was a director of GlobespanVirata.

28

71.    Defendant Geday, although no longer a member of the Company's Board of Directors, was a member of the Board and Conexant's Chief Executive Officer from the beginning of the Relevant Period until his resignation on or about November 9, 2004.    Prior to Conexant's acquisition of GlobespanVirata, Geday was GlobespanVirata's CEO, President and a Director from April 1997 until its acquisition in February 2004.

72.    Because of the Individual and Director Defendants' positions with the Company, they had access to the adverse, undisclosed information about its business, operations, products, operational trends, financial statements, markets, as well as present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

73.    The Individual and Director Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.    Because of their Board membership and/or executive and managerial positions with Conexant, each of the Individual and Director Defendants had access to the adverse undisclosed information about Conexant's business prospects and financial condition and performance as particularized herein and knew (or

29

recklessly disregarded) that these adverse facts rendered the positive representations made by or about Conexant and its business issued or adopted by the Company materially false and misleading.

74.     The Individual and Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period.   Each of the Individual and Director Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of these Defendants is responsible for the accuracy of the public reports and releases detailed herein and the representations contained therein.

75.     As a result of the facts set forth herein, Plaintiff has not made any demand on Conexant's Board of Directors to institute this action against the Individual and Director Defendants.   Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the additional following reasons:

    a.      During the Relevant Period, Defendant Geday benefited from the sale of 452,826 shares of Conexant stock for total proceeds exceeding $679,000. Because Defendant Geday received a personal financial benefit from the challenged insider trading transactions this Defendant is interested and any demand upon him is futile;

    b.      During the Relevant Period, Defendant Iyer benefited from the sale of 50,000 shares of Conexant stock for total proceeds exceeding $370,000. Because Defendant Iyer received a personal financial benefit from the challenged insider trading transactions this Defendant is interested and any demand upon him is futile;

30

c.      Defendants Decker, Beall and Stead are all directors of Mindspeed
        Technologies, which is a spin-off company of Conexant.   In connection
        with the spin-off, Mindspeed entered into a Credit Agreement with
        Conexant, under which Mindspeed may borrow up to $50.0 million for
        working capital and other corporate purposes. Because of this
        relationship, coupled with the knowledge that Decker and Beall also serve
        on the Investment Committee of Conexant, it is reasonable to conclude
        that Decker, Beall and Stead would not sue each other.  As such, demand
        is futile;

d.      Further, Defendant Iyer serves as a consultant to Mindspeed.  Mindspeed
        was reimbursed by Conexant through January 2005 for costs incurred on
        behalf of Iyer.  In 2004, such reimbursement payments totaled $583,451.
        Because of this pre-existing relationship and the fact that Decker, Beall
        and Snead are on Mindspeed's Board, it is reasonable to conclude that
        Iyer relies on them for his position as a consultant at Mindspeed.   As
        such, demand on Iyer is futile;

e.      Defendants Decker, Beall and Iyer know each other through their
        business relationships at Conexant and Mindspeed, they also are all
        directors of Skyworks Solutions, Inc.   Because of their extensive
        relationship, it is reasonable to conclude that Decker, Beall and Iyer would
        not sue each other.  As such, demand is futile;

f.      Furthermore, Defendants Decker and Beall are also Directors of the
        privately-held Jazz Semiconductor, Inc.   Combining the various board
        memberships that Decker and Beall share, including the Investment
        Committee at Conexant, they have extensive business ties to each other.
        As such, it is reasonable to conclude that neither Decker nor Beall would
        sue each other.  As such, demand on Decker and Beall is futile;

g.      Further, Defendant Decker now serves as the CEO of the Company in
        addition to serving on the Company's Board.  Because Decker serves in
        such a dual capacity, he is considered an insider.  As such, demand on
        Defendant Decker is futile;

h.      Defendants Bilodeau, Deb, Geday, Marren and Zocco were on the Board
        of Directors of GlobespanVirata, which was acquired by Conexant, with
        Deb and Geday serving together since 1999.  While Zocco, by contrast,
        was on the Board in 2001, Marren in 2000 and Bilodeau in 2003.  All of
        these individuals were on the Board of GlobespanVirata since 2003.
        Defendant Geday was the CEO of GlobespanVirata prior to its acquisition.
        Because of this pre-existing relationship, it is reasonable to presume that
        Bilodeau, Deb, Marren and Zocco would sue not each other, nor would
        they sue Geday.  As such, demand on Bilodeau, Deb, Marren and Zocco
        is futile;

31

i.    A majority of Conexant's Board of Directors and senior management participated in the wrongs complained of herein.  Conexant's directors are not disinterested or independent due to the following:    Director Defendants served on the Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the Director Defendants breached the fiduciary duties that they owed to Conexant and its shareholders in that they failed to prevent and correct material misrepresentations made by the Company.  Further, the Director Defendants are not independent because of their stake in the financial performance of the Company;

j.    Defendants Biloudeau, Deb, Decker, Beall, Geday, Iyer Marren, Stead, and Zocco, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

k.    The Director Defendants of Conexant, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Conexant's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.   Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

l.    In order to bring this suit, a majority of the Directors of Conexant would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;[1]

m.    The acts complained of constitute violations of the fiduciary duties owed by Conexant's officers and directors and these acts are incapable of ratification;

n.    Any suit by the current directors of Conexant to remedy these wrongs would likely expose the Individual and Director Defendants, and Conexant, to additional liability for violations of the securities laws that would result in civil actions being filed against the Individual and Director Defendants.  Decker is presently a Defendant in securities class action

[1] Because the Board of Conexant consists of ten (10) members, Plaintiff only needs to show that demand against five (5) directors would be futile.

I:\Conexant\Complaint.doc

lawsuits; thus, he is hopelessly conflicted in making any supposedly independent determination whether to sue himself;

o.     Conexant has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Conexant any part of the damages Conexant suffered and will suffer thereby or to recover the profits received by Geday, Rhodes and Iyer through illegal insider trading;

p.     If the current Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual and Director Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

q.     If Conexant 's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Conexant. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual and Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Conexant against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Conexant, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Conexant to sue them, since they will face a large uninsured liability.

33

76.     Plaintiff has not made any demand on the shareholders of Conexant to institute this action since demand would be a futile and useless act for the following reasons:

a.     Conexant is a publicly held company with approximately 471 million shares outstanding, and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

77.     Conexant has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.   Such expenditures will include, but are not limited to:

a.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.     Costs and legal fees for defending Conexant and the Individual Defendants against private class action litigation arising from illegal and improper conduct alleged herein.

## FIRST CAUSE OF ACTION

### Against The Individual Defendants for
### Breach of Fiduciary Duties, for Insider Selling
### and for Misappropriation of Information

78.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through seventy-seven (77) above, as set forth fully herein.

79.     At the time of the stock sales set forth herein by the Individual Defendants, they knew the information described above and sold Conexant common stock on the basis of such information.

34

80.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Individual Defendants used for their own benefit when they sold Conexant common stock.

81.     The Individual Defendants' sale of Conexant common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

82.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

## SECOND CAUSE OF ACTION

### Against Individual and Director Defendants
### for Breach of Fiduciary Duty

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through eighty-two (82) above as set forth fully herein.

84.     The Individual and Director Defendants owed and owe Conexant fiduciary obligations.   By reason of their fiduciary relationships, Individual and Director Defendants owed and owe Conexant the highest obligation of good faith, fair dealing, loyalty and due care.

85.     The Individual and Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

I:\Conexant\Complaint.doc

86.     The Individual and Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

87.     As a direct and proximate result of the Individual and Director Defendants' failure to perform their fiduciary obligations, Conexant has sustained significant damages.  As a result of the misconduct alleged herein, the Individual and Director Defendants are liable to the Company.

88.     Plaintiff, on behalf of Conexant, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

#### Against The Individual and Director Defendants
#### for Abuse of Control

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through eighty-eight (88) above as set forth fully herein.

90.     The Individual and Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Conexant, for which they are legally responsible.

91.     As a direct and proximate result of the Individual and Director Defendants' abuse of control, Conexant has sustained significant damages.

92.     As a result of the misconduct alleged herein, the Individual and Director Defendants are liable to the Company.

93.     Plaintiff, on behalf of Conexant, has no adequate remedy at law.

36

## FOURTH CAUSE OF ACTION

### Against The Individual and Director Defendants
### for Gross Mismanagement

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through ninety-three (93) above as set forth fully herein.

95.     By their actions alleged herein, the Individual and Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Conexant in a manner consistent with the operations of a publicly held corporation.

96.     As a direct and proximate result of the Individual and Director Defendants' gross mismanagement and breaches of duty alleged herein, Conexant has sustained significant damages in excess of tens of millions of dollars.

97.     As a result of the misconduct and breaches of duty alleged herein, the Individual and Director Defendants are liable to the Company.

98.     Plaintiff, on behalf of Conexant, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Individual and Director Defendants
### for Waste of Corporate Assets

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through ninety-eight (98) above as set forth fully herein.

100.    As a result of the Individual and Director Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual and Director

37

Defendants have caused Conexant to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Individual and Director Defendants' unlawful actions.

101.   As a result of the waste of corporate assets, Individual and Director Defendants are liable to the Company.

102.   Plaintiff, on behalf of Conexant, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### Against The Individual and Director Defendants
### for Unjust Enrichment

103.   Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred two (102) above as set forth fully herein.

104.   By their wrongful acts and omissions, the Individual and Director Defendants were unjustly enriched at the expense of and to the detriment of Conexant.

105.   Plaintiff, as shareholder and representative of Conexant, seeks restitution from the Individual and Director Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual and Director Defendants, from their wrongful conduct and fiduciary breaches.

## SEVENTH CAUSE OF ACTION

### Against Individual Defendants,
### Pursuant to 15 U.S.C. §7243 (SARBANES-OXLEY ACT)

106.   Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred five (105) above as set forth fully herein.

107.   Based upon the allegations made above and pursuant to 15 U.S.C. §7243, Conexant is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation paid to Individual and Defendants, as well as any profits realized from the sale of Conexant securities by them.

**EIGHTH CAUSE OF ACTION**
**Against the Insider Defendants for Violations of**
**California Corporations Code §25402**

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred seven (107) abcve as set forth fully herein.

109.   At the time of the stock sales set forth herein, the Insider Defendants knew the information described above, and sold Conexant common stock on the basis of such information in violation of California Corporation Code §25402.  The information described above was proprietary, non-public information concerning the Company.

110.   Pursuant to California Corporations Code §25502.5, the Insider Defendants are liable to Conexant for damages in an amount up to three times the difference between the price at which that Conexant common stock would have had at the time of the sale if the information known to defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

39

111.   The Company is entitled to the imposition of a constructive trust on any profits the Insider Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to Conexant restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

40

DATED: May 20, 2005               Respectfully Submitted,



_____

Christopher A. Seeger
David R. Buchanan
**SEEGER WEISS LLP**
550 Broad Street, Suite 920
Newark, New Jersey  07102
Tel:  (973) 639-9100
Fax:  (973) 639-9393

   and

William B. Federman
**FEDERMAN & SHERWOOD**
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone:  (405) 235-1560
Fax:  (405) 239-2112

## VERIFICATION

I, DANIEL M. JOHNSON /Annie Johnson declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") prepared on behalf of **Conexant Systems, Inc.**, and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of **Conexant Systems, Inc.** common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

15 MAY 2005
Date

I:\Conexant\VERIFICATION.doc